## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WEST VIRGINIA HIGHLANDS
CONSERVANCY,

        **Plaintiff,**

    **v.**

UNITED STATES FOREST SERVICE,

TOM VILSACK, Secretary, United States
Department of Agriculture,

RANDY MOORE, Chief, United States
Forest Service,

GINA OWENS, Regional Forester
for the Eastern Region of the United States
Forest Service,

SHAWN COCHRAN, Forest Supervisor,
Monongahela National Forest,

JACK TRIBBLE, District Ranger,
Greenbrier Ranger District,

        **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ELECTRONICALLY FILED
4/14/2023
U.S. DISTRICT COURT
Northern District of WV

Case No. 2:23-cv-6

Hon. Kleeh

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff West Virginia Highlands Conservancy ("the Conservancy") seeks declaratory and injunctive relief against Defendants United States Forest Service, Tom Vilsack in his official capacity as Secretary of the United States Department of Agriculture, Randy Moore in his official capacity as Chief of the United States Forest Service, Gina Owens in her official capacity as Regional Forester for the Eastern Region of the United States Forest Service, Shawn Cochran in his official capacity as Forest Supervisor for the Monongahela National Forest, and Jack Tribble

in his official capacity as District Ranger for the Greenbrier Ranger District (collectively, "the Forest Service"), in relation to the Forest Service's March 18, 2022 Decision Notice approving the Greenbrier Southeast Project in the Monongahela National Forest, including the Forest Service's Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") under the National Environmental Policy Act ("NEPA").

The Greenbrier Southeast Project ("the Project") is a forest management project in the Monongahela National Forest, located primarily in the East Fork of the Greenbrier River watershed in Pocahontas County, West Virginia. The Project involves extensive timber harvest—including hundreds of acres of clear cutting—and construction of roads and skid trails that will greatly impact the environmental health of the Project area. Of particular concern, the Project will result in increased sedimentation in streams that support native brook trout and are designated critical habitat for the endangered candy darter. Such sedimentation could prove to be detrimental to the species' existence.

Despite the potentially devastating impact that Project activities will have on the endangered candy darter, the Forest Service failed to articulate a satisfactory explanation for its action or make a rational connection between the facts found and the choice made in issuing its Final Decision Notice and Finding of No Significant Impact. Specifically, the Forest Service relied on evidence that runs counter to the record, namely that increased sedimentation levels would be the result of "natural processes."

Though the Forest Service issued its Final Decision Notice and Finding of No Significant Impact on March 18, 2022, it has not yet advertised a sale package or opened the Project for timber harvest bids. The damage that would be caused by the Project, which the Forest Service has

impermissibly ignored, can thus be prevented by an order of this Court vacating the Decision Notice and remanding to the agency so that it may comply with NEPA.

In support of this Complaint, the Conservancy states the following:

1.     Plaintiff brings this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553–559, 701–706 against the Forest Service for its approval of the Amended Final Environmental Assessment ("EA") and issuance of the Final Decision Notice and Finding of No Significant Impact ("DN/FONSI") for the Project in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §4321 *et seq.*

2.     The Conservancy contends that the Forest Service's issuance of the EA and DN/FONSI for the Greenbrier Southeast Project is arbitrary and capricious, and violates the requirements of NEPA and the APA.

## JURISDICITION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), 28 U.S.C. §2201 (declaratory relief), and 28 U.S.C. §2202 (injunctive relief) because this case arises under federal laws of the United States, including NEPA and the APA.

4.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(e)(1) because "a substantial part of the events or omissions giving rise to the claim occurred" in the Greenbrier Ranger District of the Monongahela National Forest in Pocahontas County, West Virginia. In particular, the Forest Service issued the EA and DN/FONSI from its Monongahela National Forest Headquarters office in Elkins, West Virginia.

5.     The Conservancy and its members are persons adversely affected or aggrieved by a federal agency action within the meaning of Section 702 of the APA. 5 U.S.C. §702.

6.     The Conservancy has exhausted its administrative remedies by timely submitting written comments on the Draft EA on May 15, 2020, and by timely filing an objection to the Final EA and Draft DN/FONSI on January 3, 2021 pursuant to 36 C.F.R. §218.8.

## PARTIES

7.     Plaintiff West Virginia Highlands Conservancy, Inc. is a nonprofit organization incorporated in West Virginia. It has approximately 1,700 members. The Conservancy promotes, encourages, and works for the conservation, preservation, management, and appreciation of the natural resources of West Virginia. The Conservancy is dedicated to protecting the cultural, social, education, physical, spiritual, and economic health of West Virginia for the benefit of present and future generations of residents and visitors.

8.     The Conservancy has members, including Rick Webb, Lucile Miller, Andrew and Linsey Young, Lynn and Malcolm Cameron, Randy Kesling, and Dawn Barrett who use, enjoy, and benefit from the water quality of streams that will be affected by the Project's activities:

    a.  Rick Webb lives adjacent to and regularly visits the Monongahela National Forest, including the Project area. He is a fisherman, natural history enthusiast, and a scientist with a particular interest and appreciation for the mountain streams located within the Project area that support native brook trout, the endangered candy darter, and other species. Rick gains great personal value from studying and recreating in the streams within the Project area. Rick regularly visits the Monongahela National Forest and the Project area for research and recreation, and intends to continue visiting regularly throughout the year. If the Project proceeds and the water quality of the streams within the Project area are diminished and no longer support native

brook trout or the candy darter, Rick will imminently suffer great personal and aesthetic injury.

b. Lucile Miller owns a 652.1-acre tract of land directly adjacent to the Project area, which she has placed into a conservation easement for the express purpose of conserving, in perpetuity, the property's natural values, including its unfragmented forest and pristine water quality. Lucile's property borders the Project area along the eastern side, between the streams Mullenax Run and Newman Run, both of which are habitat to native brook trout, a species she values greatly. Lucile is deeply concerned about the impacts to the water quality on her property as a result of sedimentation caused by the Project activities. Lucile is also an avid birder, and is concerned that the Project's proposed clearcutting will destroy valuable bird habitat. If the Projects proceeds and the water quality on her property is diminished and the bird habitat destroyed by forest fragmentation, Lucile will imminently suffer great personal and aesthetic injury.

c. Andrew and Linsey Young love to hike and camp in Laurel Fork, a Special Biological Area directly adjacent to the Project area. Andrew and Linsey visit Laurel Fork at least every two to three months, and enjoy the incredible biodiversity the area has to offer. While hiking the trails in the Laurel Fork area, Andrew and Linsey love to see the vibrant wildlife, including songbirds, owls, native brook trout, candy darters, timber rattlesnakes, and northern flying squirrels. They also love to see the forests and natural beauty of such an untouched and remote place. If the trails, water quality, and wildlife are adversely impacted as a result of the Project, Andrew and Linsey will not enjoy visiting the Laurel Fork area as much as they do now. If the

Project proceeds and the trails, water quality, and wildlife are destroyed or degraded, Andrew and Linsey would suffer great personal and aesthetic injury.

d. Lynn and Malcolm Cameron love to drive through the Project area and visit Laurel Fork. They have been hiking and camping in the Laurel Fork area for the past 25 years, and hope to continue doing so in the future. Every year, Lynn and Malcolm Cameron host an annual Fourth of July hike in Laurel Fork with their hiking club. They have also brought youth groups there and hosted a memorial service for their close friend there. Laurel Fork is one of their favorite places in the world. The biodiversity in both the native plant species and wildlife in the Laurel Fork area is something they both care deeply about. Lynn and Malcolm Cameron love to see the native plants like cardinal flower, running cedar, and bergamot on their drives through the Project area and in Laurel Fork. The red spruce is another species they love to see, and which is unique to the region. As a result of the Project activities, Lynn and Malcolm are very concerned about invasive species moving in and destroying the native plant species, as well as the viability of the red spruce forest. Lynn and Malcolm Cameron also enjoy seeing the many different animal species that live in the Laurel Fork area, including the northern flying squirrel, brook trout, beavers, salamanders, and songbirds like the wood thrush, hermit thrush, indigo bunting, scarlet tanager, and warblers. Lynn and Malcolm Cameron are very concerned about the negative impacts caused by the Project activities, including forest fragmentation and habitat loss. They consider Laurel Fork to be the most beautiful place they have ever seen, and would be deeply saddened if its beauty and sensitive features were destroyed. If the Project proceeds and the plants and animal

species of Laurel Fork and the Project area are impacted, Lynn and Malcolm will suffer great personal and aesthetic injury.

e.  Randy Kesling regularly recreates in the Monongahela National Forest, and in particular the Project area. He visits the Monongahela National Forest at least three times a year to fish and hike, and intends to continue doing so in the future. In particular, he enjoys fishing in the East Fork of the Greenbrier River, and several of its tributaries, including Abe's Run and Poca Run, each of which is in the Project area. Randy enjoys these streams because they are home to native brook trout and the endangered candy darter, as well as other sensitive species. Randy is very concerned about the Project's impacts to the water quality of the streams due to sedimentation and damage to the riparian buffers. He worries that the Project will destroy the habitat and disrupt the reproduction and survival of sensitive species, like the candy darter. If the Project continues and the water quality of the streams is impacted, Randy will be disappointed and will not enjoy fishing and hiking in the area as much as he does now.

f.  Dawn Barrett lives and operates an organic farm on her property directly adjacent to the Project area and two proposed clear-cutting sites. She is very concerned about the impact the Project will have on her property and farm. Dawn has operated an organic farm for over 20 years. Her farm is completely free of chemicals, and her goats, chickens, and ducks are all free range. In addition, Dawn often forages for plants and herbs to make homemade tea for herself and her family. Because of this, Dawn is very concerned about the use of chemicals on the Project area after the trees are clearcut and its impact on her farm animals and the wild plants she forages. Dawn

is also worried about the clearcutting on the border of her property because her property lies on top of the ridge and will be severely impacted by the removal of a wind barrier. Lastly, Dawn loves to see the diversity of animal species on and near her property and is concerned about the forest fragmentation and habitat loss for the owls, raptors, and other birds. Dawn deeply cares about the health of the Monongahela National Forest and the water quality of that region. If the Project proceeds and her property is impacted by chemicals or the wildlife suffers habitat loss, she will suffer both personal and aesthetic injury.

9.      The Conservancy's requested relief is proper because it will redress the injuries to the Conservancy and its members. Unless this Court grants the relief requested, the Forest Service's actions will cause irreparable harm to the environment and natural resources, and to the Conservancy's and its members' interests. The Forest Service's actions in approving the EA and issuing the DN/FONSI will irreparably harm the Conservancy and its members because the proposed timber harvesting activities will significantly impair and adversely affect the Conservancy's members' use and enjoyment of the affected land and natural resources. No monetary damages or other legal remedy will adequately redress the Conservancy or its members from this harm.

10.     Defendant United States Forest Service is an agency within the United States Department of Agriculture and is charged with, among other things, managing the lands and resources within the Monongahela National Forest in accordance with NEPA. The Forest Service is responsible for overseeing the preparation of Environmental Assessments, deciding whether further review in the form of an Environmental Impact Statement is required, and approving or denying projects subject to NEPA in the form of Decision Notices.

11.      The Forest Service, through its Greenbrier Ranger District in Pocahontas County, West Virginia, has approved the Greenbrier Southeast Project and published the DN/FONSI at issue in this case. In issuing the DN/FONSI for the Greenbrier Southeast Project, the Forest Service found that there was "no significant impact" on the human environment and that as a result, an Environmental Impact Statement was not required.

12.      Defendant Tom Vilsack is the Secretary of the United States Department of Agriculture ("USDA"). Secretary Vilsack oversees the USDA's activities and those of its agencies, including the Forest Service. Secretary Vilsack is listed as a defendant in his official capacity as Secretary of the USDA.

13.      Defendant Randy Moore is the Chief of the United States Forest Service. Chief Moore, "under the direction of the Secretary of Agriculture, administers the formulation, direction, and execution of Forest Service policies, programs, and activities." 36 C.F.R. §200.1(b). Chief Moore is listed as a defendant in his official capacity as Chief of the Forest Service.

14.      Defendant Vicki Christensen is the Regional Forester for the Eastern Region of the United States Forest Service, Region 9, which includes the Monongahela National Forest. Regional Forester Christensen oversees and leads the land management programs for the region. Regional Forester Christensen is listed as a defendant in her official capacity as Regional Forester for the Eastern Region of the Forest Service.

15.      Defendant Shawn Cochran is the Forest Supervisor for the Monongahela National Forest. Supervisor Cochran is responsible to the Regional Forester for the management of the Monongahela National Forest, including the Greenbrier Ranger District. 36 C.F.R. §200.2(a)(1). Supervisor Cochran is listed as a defendant in his official capacity as Forest Supervisor for the

Monongahela National Forest. Defendant Cochran signed the Forest Service's response to the Conservancy's objection to the Draft DN/FONSI.

16.     Defendant Jack Tribble is the District Ranger for the Greenbrier Ranger District of the Monongahela National Forest. He is responsible to the Forest Supervisor for supervising the Greenbrier Ranger District. 36 C.F.R. §200.2(a)(2). District Ranger Tribble approved the EA and signed the DN/FONSI at issue in this case. District Ranger Tribble is listed as a defendant in his official capacity as District Ranger for the Greenbrier Ranger District of the Monongahela National Forest.

## LEGAL FRAMEWORK

### *The Administrative Procedure Act*, **5 U.S.C. §§701–706**

17.     The Administrative Procedure Act ("APA") provides the right of judicial review to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. §702.

18.     Any "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." *Id.* at §704.

19.     In reviewing an agency action, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* at §706(2)(A).

### *The National Environmental Policy Act*, **42 U.S.C. §4321** *et seq.*

20.     The National Environmental Policy Act ("NEPA") was established "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. §4321. NEPA is "intended to ensure Federal agencies consider the

environmental impacts of their actions in the decision-making process." 40 C.F.R. §1500.1(a).
"The purpose and function of NEPA is satisfied if Federal agencies have considered relevant
environmental information, and the public has been informed regarding the decision-making
process." *Id.*

21.     "The sweeping policy goals" of NEPA require Federal agencies to take a "hard
look" at the environmental consequences of their proposed actions. *Robertson v. Methow Valley
Citizens Council*, 490 U.S. 332, 350 (1989).

22.     NEPA requires a Federal agency to prepare a detailed Environmental Impact
Statement ("EIS") for any "major Federal actions" that may "significantly affect[] the quality of
the human environment." 42 U.S.C. §4332(2)(C). "Major Federal actions" include a Federal
agency's "[a]pproval of specific projects, such as construction or management activities located in
a defined geographic area. Projects include actions approved by permit or other regulatory decision
as well as Federal and federally assisted activities." 40 C.F.R. §1508.1(q)(3)(iv).

23.     NEPA is procedural in nature, *id.* at §1500.1(a), and requires a preliminary
determination of the appropriate level of review, *id.* at §1501.3. "In assessing the appropriate level
of NEPA review, Federal agencies should determine whether the proposed action: (1) Normally
does not have significant effects and is categorically excluded; (2) Is not likely to have significant
effects or the significance of the effects is unknown and is therefore appropriate for an
environmental assessment; or (3) Is likely to have significant effects and is therefore appropriate
for an environmental impact statement." *Id.* at §1501.3(a).

24.     In determining whether any effects or impacts on the human environment from the
proposed action may be "significant," Federal agencies must "analyze the potentially affected
environment and degree of the effects in the action." *Id.* at §1501.3(b). When considering the

degree to which the proposed action effects or impacts the human environment, Federal agencies should consider: "(i) Both short- and long-term effects. (ii) Both beneficial and adverse effects. (iii) Effects on public health and safety. (iv) Effects that would violate Federal, State, Tribal, or local law protecting the environment." *Id.* at §1501.3(b)(2).

25.    A Federal agency may first prepare an Environmental Assessment ("EA") to determine whether a proposed action may have a significant impact on the human environment and therefore require an Environmental Impact Statement ("EIS"). *Id.* at §1501.3(a)(2).

26.    An EA must "(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; and (2) Briefly discuss the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, and the environmental impacts of the proposed action and alternatives, and include a listing of agencies and persons consulted." 40 C.F.R. §1501.5(c).

27.    "Environmental impacts of the proposed action" means the direct, indirect, or cumulative effects of the proposed action on the human environment. *Id.* at §1508.1(g). These effects can be "ecological . . . , aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id.* They may also "result[] from actions which may have both beneficial and detrimental effects, even if on balance the agency believes the effects will be beneficial." *Id.*

28.    Thus, because an EA must discuss the environmental impacts of the proposed action, the Agency preparing the EA must consider the direct, indirect, and cumulative effects of the proposed action on the human environment. Cumulative effects "are effects on the environment that result from the incremental effects on the action when added to the effects of other past, present and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person

undertakes such actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time." *Id.* at §1508.1(g)(3); 42 U.S.C. §4332(2)(C).

29.     The Agency must also discuss alternatives to the proposed action and the environmental impacts of those alternatives. 40 C.F.R. §1501.5(c)(2); 42 U.S.C. §4332(2)(E).

30.     Implicit in this requirement to consider the direct, indirect, and cumulative impacts of the proposed action and alternatives is the need to consider the "'baseline' condition reflecting the state of the environment absent any undertaking pursuant to the permit." *See Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012).

31.     Under the Forest Service's specific NEPA compliance regulations, an EA must also include: (1) Need for the proposal; (2) Proposed action and alternatives; (3) Environmental impacts of the proposed action and alternatives; and (4) Agencies and persons consulted. 36 C.F.R. §220.7(b). In the "Environmental Impacts" section of a Forest Service EA, the Forest Service "[s]hall describe the impacts of the proposed action and any alternatives in terms of context and intensity as described in the definition of 'significantly' at 40 C.F.R. §1508.27."[1] *Id.* at §220.7(b)(3)(iii).

32.     If the Federal agency determines that the proposed project will not significantly affect the environment based on the completed EA, it must prepare a Finding of No Significant Impact ("FONSI"). 40 C.F.R. §1501.6(a). The FONSI must explain an agency's reasons for why the proposed action "will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." *Id.* at §1508.1(l).

---

[1] In July 2020, the Council for Environmental Quality made widespread "revisions" to the NEPA regulations, entirely eliminating the definition of "significantly" that was previously found at 40 C.F.R. §1508.27 that had been in place since NEPA's inception, instead choosing to rely on 40 C.F.R. §1501.3(b) to provide guidance on determining the "significance" of environmental impacts. 85 Fed. Reg. 43,304, 43,351 (Jul. 16, 2020).

33.     NEPA is subject to judicial review under the APA. *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 189 (4th Cir. 2009).

34.     This judicial review is deferential to the agency's expertise; however, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Sierra Club v. U.S. Department of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Manufacturer's Association of the United States, Inc. v. State Farm Mutual Automobile Insurance, Co.*, 463 U.S. 29, 43 (1983)).

35.     "Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise.'" *Id.*

## FACTS

36.     The Greenbrier Southeast Project ("the Project") is located in Pocahontas County, West Virginia, in the Greenbrier Ranger District of the Monongahela National Forest. The Project covers approximately 16,888 acres, 85% of which is Forest Service land. The Project lies within the headwaters of the East Fork Greenbrier watershed, and proposes over a thousand acres of timber harvest and over 50 miles of road and skid trail construction.

37.     The Monongahela National Forest is home to many wildlife species, notably including the endangered candy darter. Much of the candy darter's designated critical habitat and remaining occupied habitat is in the Monongahela National Forest. In fact, the U.S. Fish and Wildlife Service ("FWS") recently designated critical habitat for the candy darter under the

Endangered Species Act on April 7, 2021, including unit areas located within the Project area. *Endangered and Threatened Wildlife and Plants: Designation of Critical Habitat for Candy Darter*, 86 Fed. Reg. 17,956 (Apr. 7, 2021).

38.    In its designation, the FWS included a specific unit along the East Fork of the Greenbrier River, precisely where the Project is located:



*Id.* at 17,963, 17,974.

39.    The endangered candy darter is a sensitive species; the colorful fish has experienced historical habitat degradation and fragmentation, as well as hybridization with other species, since 1932 when the species was first described. Indeed, nearly half of the original 35 candy darter populations have completely disappeared, with only 18 threatened and fragmented populations remaining. *See Candy Darter Fact Sheet*, U.S. Fish & Wildlife Service (Sep. 2017), https://www.fws.gov/sites/default/files/documents/508_candy%20darter%20fact%20sheet.pdf.

40.    The endangered candy darter is a "habitat specialist" and is "'generally intolerant of excessive stream sedimentation'; indeed, '[e]xcessive sedimentation was likely a primary cause of the [darter's] historical decline.'" *Appalachian Voices v. U.S. Department of Interior*, 25 F.4th 259, 267–68 (4th Cir. 2022). Despite the endangered candy darter's vulnerability, the Forest Service has decided to proceed with the Project, which will undoubtedly impact the species.

41.    On or about July 17, 2019, the Forest Service began its NEPA process for the Project by publishing its Scoping Notice. During the scoping period, the Conservancy provided comments that raised several concerns with the Project, particularly about the need to ensure that the Project would not "un-do" any of the work the Forest Service had already put into watershed restoration in the area.

42.    Following the scoping period, on April 16, 2020, the Forest Service released its Draft Environmental Assessment ("Draft EA") for the Project for public comment.

43.    On May 15, 2020, the Conservancy submitted its comments on the Draft EA, raising particular concern with the Forest Service's reliance on unsupported conclusory statements and analysis from a Biological Assessment ("BA") and Biological Evaluation ("BE") prepared pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, neither of which had, at that point, been completed or provided to the public. In its comments, the Conservancy noted

several times the Draft EA made unsupported conclusory statements or conclusively relied on the incomplete and unavailable BA, including:

a. Page 27 of the Draft EA states, "For candy darter, the proposed action may affect, but is not likely to adversely affect the species or proposed critical habitat." The Conservancy commented that there was no analysis or other rationale given to support this statement.

b. Pages 36–51 of the Draft EA "summarize[] the effects on terrestrial animal species from the biological assessment (BA) located in the project record." The Conservancy commented that the BA had neither been completed nor provided to the public for review in the comment period, and it therefore was not able to review the document upon which the Draft EA relied.

c. Page 44 of the Draft EA states, "Under the action alternative, the potential for direct and indirect effects to wildlife [Regional Forester Sensitive Species] is so small it is considered discountable." The Conservancy commented that the preceding analysis of direct and indirect effects failed to provide any evidence in support of this statement, and instead simply made a series of unsupported conclusory statements.

d. Page 44 of the Draft EA further states, "With a few minor exceptions that could improve habitat, no ongoing or reasonably foreseeable future Forest Service actions would impact known occurrences of the impacted [Regional Forester Sensitive Species]. . . . In addition to potential habitat for the [Regional Forester Sensitive Species] in the project area, all other species have potential habitat with known occurrences in locations scattered across the Forest (USFS unpublished data). None of these occurrences are expected to be impacted in the foreseeable future." The

Conservancy commented that these are conclusory statements, and that no attempt was made to determine the potential effects of the Forest Service actions. It also noted the USFS unpublished data referenced was not publicly available and could therefore not be relied upon.

44.     Ultimately, the Conservancy urged the Forest Service to provide the missing BA, BE, and other supporting materials or data used in preparing the Draft EA and then hold another 30-day public comment period.

45.     In addition to the general concerns related to the Draft EA's reliance on unsupported conclusory statements and missing materials, the Conservancy also provided comments on the Draft EA's environmental impact review. In particular, the Conservancy flagged that the Forest Service's environmental impact analysis also lacked specificity and similarly failed to provide sufficient factual or scientific information to meaningfully assess the environmental impacts of the proposed activities.

46.     Following the comment period on the Draft EA, the Forest Service requested a formal consultation under the ESA with FWS and provided a Streamlined BA for the Project on March 29, 2021. In the BA, the Forest Service considered the likelihood of adverse impacts to the Indiana bat, the northern long-eared bat, the candy darter, the running buffalo clover, and the small whorled pogonia. Ultimately, the Forest Service determined that the Project: (1) "may affect, likely to adversely affect" the Indiana bat; (2) "may affect, likely to adversely affect" the Northern long-eared bat; (3) "may affect, not likely to adversely affect" the candy darter; and (4) "may affect, not likely to adversely affect" both the running buffalo clover and the small whorled pogonia. The BA further requested the FWS for concurrence with these determinations and a Tier II (project-specific) Biological Opinion ("BO") from the FWS.

47.    On August 20, 2021, the FWS provided a BO based on its review of and reliance on the Forest Service's BA. Specifically, in regard to the endangered candy darter, the FWS's opinion entirely relied on the Forest Service's assurances that the planning and layout of timber harvest activities, roads, and skid trails, along with Best Management Practices ("BMPs"), habitat assessments, fish surveys, and Project design measures would ensure that "the potential for adverse effects to the candy darter from GSE [Greenbrier Southeast Project] activities is considered so low as to be insignificant and discountable."

48.    Ultimately, the FWS concurred with the Forest Service's "may affect, not likely to adversely affect" determinations for the candy darter, small whorled pogonia, and running buffalo clover. The FWS further concurred with the "may affect, likely to adversely affect" determinations for the Indiana bat and northern long-eared bat.

49.    On or about November 18, 2021, the Forest Service released its Final EA and Draft Decision Notice and Finding of No Significant Impact ("Draft DN/FONSI") to the public for comment.

50.    The Final EA and Draft DN/FONSI included the same issues that the Conservancy identified in comments to the Draft EA, namely a lack of specificity within the environmental impact analysis and insufficient factual and scientific information to support conclusions related to environmental impacts.

51.    In its environmental impacts analysis on the endangered candy darter, the Final EA relied only on the conservation measures incorporated into the project design to conclude that "the proposed action may affect, but is not likely to adversely affect the species or proposed critical habitat." In discussing the increased sedimentation from Project activities, the Final EA relied on monitoring data from five locations to conclude that "[t]he percentage of fine sediment is showing

a relatively stable trend across the analysis streams." The Final EA did not discuss baseline conditions, provide scientific data (other than sample data at the five locations), or provide stream evaluations for designated critical habitat of the candy darter to support these conclusions.

52.    Likewise, the Draft FONSI reiterated the Final EA's conclusions regarding the candy darter and determined that the Project's "planning, adherence to the Forest Plan standards and guides, and the inclusion of conservation measures, design features, mitigation measures, and best management practices will result in no significant effect to the candy darter."

53.    On January 3, 2022, the Conservancy filed a written objection to the Final EA and Draft DN/FONSI with the Forest Service.

54.    In its objection, the Conservancy noted the Forest Service's failure to meaningfully analyze the environmental impacts from the Project on the endangered candy darter, including: (1) the failure to conduct or include a baseline assessment; (2) the unsupported reliance on project design features and mitigation measures to reduce project impacts to insignificant levels; and (3) the failure to conduct a cumulative effects analysis.

a.    The Conservancy objected to the Forest Service's failure to prepare a detailed environmental baseline description and evaluation for streams in the Project area that are designated critical habitat or that drain directly into critical habitat for the endangered candy darter. Specifically, the Conservancy noted that the Forest Service had available and relevant scientific information but refused to consider it; the Forest Service had reasonable access to the periodic monitoring evaluation reports prepared by the Monongahela National Forest, most recently finalized in March 2021. In its March 2021 report, the Forest Service indicated that a majority of the streams within the Monongahela National Forest are actively degraded and trending negatively due to chronic

sedimentation. The Conservancy argued that this continuing degradation of streams throughout the Monongahela National Forest, including within the Project area, due to sedimentation was a fundamental baseline condition that the Forest Service should have considered and included in its Final EA and Draft DN/FONSI.

      b.     The Conservancy also objected to the Forest Service's reliance on project designs and mitigation measures, explaining that if the Forest Service "relies on the existence of mitigation measures to conclude that impacts will not be significant pursuant to NEPA, it must ensure that the measures are likely to be successful." In its Final EA and Draft DN/FONSI, the Forest Service concluded that because of the Project's design features and mitigation measures, sedimentation effects to the candy darter would not rise to "significant." But, as the Conservancy noted in its objection, the effectiveness of these design features is uncertain and the mitigation measures are unreliable. Specifically, the drainage network designs for road construction and other ground disturbance relied upon by the Forest Service are variable and can easily change due to heavy precipitation or flow concentration, resulting in more sedimentation reaching waterways than anticipated. Additionally, the Forest Service relied upon Best Management Practices ("BMPs") to reduce sediment production during road and skid trail use, construction, and restoration. However, the Conservancy notes that standard BMPs have substantially limited utility during these periods and therefore cannot be relied upon to mitigate the environmental impacts of sedimentation.

      c.     Lastly, the Conservancy objected to the Forest Service's failure to conduct a cumulative effects analysis of the environmental impact of sediment production on the endangered candy darter. The Conservancy noted that, with respect to the candy darter and

its critical habitat, the appropriate scope for a cumulative effects analysis would include the *entire* geographic extent of designated critical habitat. But the Forest Service did not provide any cumulative effects analysis of sediment production as it pertains to the endangered candy darter or its designated critical habitat.

55.    In sum, the Conservancy called for the Forest Service to conduct a meaningful analysis of the existing sedimentation problems before proceeding with the Project, which would only exacerbate the environmental impacts of sediment production.

56.    On February 22, 2022, the Forest Service responded to the Conservancy's objection, including the three main arguments noted above. In its response to the Conservancy's comment regarding the Forest Service's unfounded reliance on design features and mitigation measures, the Forest Service claimed that the Final EA fully considered the potential for sediment production to reach waterways, as documented in the "Greenbrier Southeast Project Watershed Analysis Process." The response claims that:

> This document shows monitoring data for forest-wide stream sediment changes that are not directly associated with management activities but instead are driven by natural processes. **These data show streams in wilderness areas increasing in fine sediment and some streams in areas of management decreasing in fine sediment.** Therefore, it appears that the project planning conducted by Monongahela National Forest staff is successful in protecting streams from any quantifiable changes in sediment delivery. (Emphasis added).

57.    Thus, the Forest Service concluded that stream sedimentation in the Project area is attributed to natural processes, using several streams in wilderness areas that show increased fine sediment as support. That is, the Forest Service took the position that because streams in wilderness areas not subject to the type of timber harvest and road construction activities associated with the Project showed an increase in sediment, while other areas subject to similar activities showed a decrease in sediment, Project activities would not lead to increased sedimentation.

58.     The "Greenbrier Southeast Project Watershed Analysis Process" document that the Forest Service relied on to justify its decision, was not even created until January 19, 2022—after the comment period for the Final EA and Draft DN/FONSI—and therefore was not available to the Conservancy during the earlier stages of the NEPA process.

59.     Because the "Greenbrier Southeast Project Watershed Analysis Process" document did not provide the data used in its analysis, the Conservancy submitted a data request to the Forest Service on March 28, 2022. Specifically, the Conservancy requested the actual data values that "show streams in wilderness areas increasing in fine sediment and some streams in area of management decreasing in fine sediment."

60.     In a response dated April 25, 2022, the Forest Service identified the "Aquatic Ecological Unit Inventory" ("AEUI") as the source of data requested. The Forest Service noted that, in the AEUI, Fisheries Biologist Chad Landress identified several streams in wilderness areas with increasing fine sediment, including: Camp Five Run; Cranberry River – North Fork; Cranberry River – South Fork; Laurel Creek (Anthony Creek); Laurel Fork (Dry Fork), upper; and Williams River – Little Fork. Fisheries Biologist Chad Landress also identified several streams with active timber management during the sampling period: Glady Fork – East Fork; Hile Run; and Little River (EFGR).

61.     On or about March 18, 2022, the Forest Service released an Amended Final EA and issued the Final DN/FONSI for the Project.

62.     In its Amended Final EA and Final DN/FONSI, the Forest Service again relied on the Project's design features and mitigation measures to reduce sediment production, thereby assuring that sedimentation effects to the candy darter would not rise to "significant."

63.    The Amended Final EA reiterated the Forest Service's reliance on data showing "natural processes" were the cause of increased sediment production, noting that "numerous monitoring sites indicate levels above specific thresholds or increases in sediment in brook trout spawning gravels where no management activities have occurred, including streams in wilderness areas (e.g., Red Run and North Fork Cranberry in Cranberry Wilderness; Camp Five Run in Laurel Fork Wilderness. . . . )."

64.    In its reasoning, the Forest Service concluded that, rather than the Project's proposed earth disturbance or hydrologic alterations caused by Project activities and construction, the increased sediment production would be attributable to "natural processes," as evidenced by data from several streams in wilderness areas that show increased fine sediment and the three streams in active timber management areas that show decreased fine sediment.

65.    However, in selecting the six streams in wilderness areas to monitor, the Forest Service did not consider several relevant and determinative factors that would impact the increasing fine sediment levels seen, including:

a.    The presence of private lands with non-wilderness management located in the selected "wilderness" watersheds[2];

b.    The presence of roads in the selected watersheds, including public roads that are actively used[3]; and

---

[2] In particular, Laurel Creek (Anthony Creek) borders private lands, outside the management of the Monongahela National Forest. But moreover, private land is often interspersed with public land throughout the Monongahela National Forest, and possibly adjacent to the wilderness areas and selected streams. *See* Hunting on Monongahela National Forest, U.S. FOREST SERVICE, https://www.fs.usda.gov/activity/mnf/recreation/hunting.

[3] For each of the six selected streams, public roads are either directly adjacent or nearby. *See* Motor Vehicle Use Maps, U.S. FOREST SERVICE, https://www.fs.usda.gov/detail/mnf/maps-pubs/?cid=stelprdb5090733.

   c.  The wide variation in erosion potential of the lands in the selected watersheds due to differences in slope, soil, and bedrock.[4]

The Forest Service's dichotomy between "wilderness" and "management" areas thus represents a gross oversimplification and does not provide the basis for a reasoned decision.

   66.  Additionally, the fine sediment measurements at all nine of the selected streams—located in wilderness and active timber management areas alike—show fine sediment levels that exceed the criteria for detrimental effects to aquatic life.[5] In particular, the three streams cited as active timber management areas showing decreased fine sediment (East Fork of Glady Fork, Hile Run, and Little River (EFGB)) all had samples taken that exceeded either the 25% criterion for <4mm fine sediment, the 5% criterion for <1mm fine sediment, or both, as shown by the AEUI sample data provided and used by the Forest Service.

## CLAIM FOR RELIEF

### Violations of the National Environmental Policy Act and the Administrative Procedure Act

   67.  The Conservancy reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 66 above.

---

[4] The Monongahela National Forest lies within the larger Appalachian Mountain Range, and is noted for its rugged and diverse landscape, with elevation ranges from about 1,000 feet to over 4,800 feet above sea level. Additionally, the Monongahela National Forest is known for its diverse geological features, such as karst, and "ancient and recent landslides and debris flow." *See* Minerals and Geology, U.S. FOREST SERVICE, https://www.fs.usda.gov/detail/mnf/landmanagement/resourcemanagement/?cid=stelprdb5092 915.

[5] Pursuant to the USDA's most recent Monitoring Evaluation Report for the Monongahela National Forest, the detrimental effects criterion is 25% for <4mm and 5% for <1mm fine sediment. U.S. DEP'T OF AGRICULTURE, MONONGAHELA NATIONAL FOREST, FISCAL YEAR 2011–2019 MONITORING EVALUATION REPORT at 115 (Mar. 2021), available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd985243.pdf.

68.     Under NEPA, an EA must include "sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. §1501.5(c)(1).

69.     In reviewing a Federal agency's compliance with NEPA, courts must determine whether "the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Sierra Club*, 899 F.3d at 293 (quoting *State Farm*, 463 U.S. at 43).

70.     Where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, **offered an explanation for its decision that runs counter to the evidence before the agency**, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," courts will find that the agency has acted in an arbitrary and capricious manner. *Id.* (emphasis added).

71.     The Forest Service relied on the Project's design features and mitigation measures to reduce sediment production in its Amended Final EA and Final DN/FONSI to ensure that sedimentation effects to the candy darter would not rise to "significant."

72.     The Forest Service concluded that the increased sediment production would be caused by "natural processes," not the Project's proposed land disturbance, construction, or hydrologic alterations. To support this conclusion, the Forest Service relied on data from six streams in "wilderness" areas that it claimed show increased fine sediment and the three streams in active timber management areas that it claimed show decreased fine sediment.

73.     However, the Forest Service failed to consider several relevant and determinative factors that would impact the increasing fine sediment levels seen when selecting "wilderness" streams to monitor.

74.    Furthermore, the fine sediment measurements at all nine of the selected streams show fine sediment levels that exceed the criteria for detrimental effects to aquatic life. Therefore, contrary to the Forest Service's contentions, there is no pattern of improving conditions based on Forest Service management.

75.    Accordingly, the Forest Service failed to consider important aspects of the evidence upon which it relied, and further relied on evidence that runs counter to the evidence before it. The Forest Service therefore failed to articulate a satisfactory explanation for its decision, rendering its final determination that sediment production will not significantly impact the environment arbitrary and capricious and in violation of NEPA.

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an Order:

1.    Declaring that the Defendants' approval and issuance of the Environmental Assessment and Decision Notice / Finding of No Significant Impact for the Greenbrier Southeast Project violated the National Environmental Policy Act;

2.    Declaring that the Defendants' approval and issuance of the Environmental Assessment and Decision Notice / Finding of No Significant Impact for the Greenbrier Southeast Project violated the Administrative Procedure Act because it was arbitrary, capricious, or otherwise not in accordance with the law;

3.    Vacating, setting aside, reversing, and/or remanding the flawed Environmental Assessment and Decision Notice / Finding of No Significant Impact for the Greenbrier Southeast Project;

4.   Vacating, setting aside, reversing, and/or remanding any permits that have been granted for the Greenbrier Southeast Project in reliance on the flawed Environmental Assessment and Decision Notice / Finding of No Significant Impact;

5.   Enjoining Defendants from using the Environmental Assessment and Decision Notice / Finding of No Significant Impact in subsequent proceedings, including any decisions whether to grant permits, licenses, or approvals for the Greenbrier Southeast Project unless and until the Defendants correct its errors and comply with all requirements under the National Environmental Policy Act and Administrative Procedure Act;

6.   Awarding Plaintiffs their attorneys' fees, expert witness fees, and all other reasonable costs and expenses incurred in pursuit of this action; and

7.   Granting any other relief as this Court deems just and proper.

DATED: _____          Respectfully Submitted,


_____
BENJAMIN A. LUCKETT (WVBN 11463)
SENIOR ATTORNEY
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone:    (304) 873-6080
Email:          bluckett@appalmad.org

*Counsel for Plaintiff*